* * * * * * * * * * *
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Glenn. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Glenn with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. That all parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. All parties have been correctly designated, and there is no question as to joinder or misjoinder of the parties.
3. Plaintiff was an employee of defendant-employer IBM Corporation on April 30, 2000, and her title was Manufacturing Inventory Program Manager. Plaintiff earned an average weekly wage of $2,052.50.
4. On or about April 30, 2000 a flood occurred at plaintiff's workplace at defendant-employer's premises.
5. After continuing to work in that workplace for a period of time, plaintiff alleges she developed persistent symptoms of neurological, digestive, respiratory, and cognitive problems.
6. An employment relationship between the parties existed on or about April 30, 2000 and for a period thereafter, and the carrier on the risk for workers' compensation purposes was Liberty Mutual Group.
7. In addition to the deposition transcripts of the aforementioned witnesses and all exhibits attached thereto, the parties stipulated into evidence in this matter two notebook binders of medical records and bills and house inspection reports, labeled as Volumes I and II. In addition, the parties stipulated into evidence an affidavit by Sharon Poindexter relating to disability benefits received by plaintiff. The parties also stipulated into evidence initial and supplemental Indoor Environmental Consultant report relating to environmental studies done in IBM's Building 61. In addition, plaintiff introduced and the undersigned admitted into evidence 23 exhibits. The undersigned further takes judicial notice of all I.C. forms and orders filed in this case.
8. The issues to be determined by the Commission are as follows:
 a) Whether plaintiff developed an occupational disease as a result of her employment with defendant-employer?
 b) If so, what, if any, benefits is plaintiff entitled to receive under the North Carolina Workers Compensation Act?
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. On the dates of the hearing before the deputy commissioner in the matter, plaintiff was 43 years old and married. Plaintiff was not working in any capacity as of the dates of the hearing in the matter.
2. Plaintiff had been employed by defendant-employer since 1981. Plaintiff worked in Building 61 on defendant-employer's premises as well as other buildings in New York and RTP during her employment with IBM.
3. On the evening of Sunday, April 30, 2000, Tim Hitchcock, an industrial hygienist who at the time was employed by defendant-employer, was informed that there was a flood in Building 61, to which he and a maintenance manager responded. The flood occurred when approximately 30,000 gallons of chilled water were released from the air conditioning system into the building from a laboratory area of Building 61. As a result of their inspection, a decision was made to remove all water-damaged material, including all sheetrock, carpeting, and the lay-in ceiling tiles.
4. During the remediation process of cleaning from the flood, approximately 90 to 95 percent of all water-damaged materials were removed by Friday, May 5, 2000. During the remediation, plastic barriers were utilized, and negative air machines were used to filter out impurities. Some employees were relocated to a different building altogether during the remediation process, plaintiff remained and continued to work in Building 61. Defendant-employer and its agents used the applicable New York City Department of Health Guidelines during this remediation process; these remediation procedures are more comprehensive than those recommended by the Environmental Protection Agency.
5. As part of the remediation process, on May 4, 2000 bulk samples from within and outside the water damaged areas were collected. Samples from the wallboard had organisms at less than the limits of detection, while samples from the carpet were slightly above the limits of detection. On May 5, 2000, air samples were taken within the water damaged area, from outside of the water damaged area, and from outdoors. Three locations identified did have small visible colonies of fungal growth. All indoor samples except for one contained less potentially mold-causing organisms than those found in the outdoors sample.
6. After the flood and demolition process, hazard assessments were done in response to three air quality complaints. There was a visual inspection done of the offices and the air handling units. Various measurements, such as for carbon monoxide, relative humidity, and temperature were taken, and certain remedial steps undertaken, such as taking the air handling units off outside air so as to lower the humidity level. While dirt was found on the air handling unit's fan (which was later cleaned), the industrial hygienist testified that this was a good thing, as it was evidence that the filters were working. While the dirt in the filters revealed some fungal organisms, this was entirely expected. Mr. Hitchcock testified that his post-flood inspections of Building 61 did not reveal any "observable problem" with respect to mold concentration.
7. Plaintiff testified she was scheduled to work in Building 61 after the flood, as she had done prior to the flood.
8. Plaintiff went out of work on or about July 5, 2001 on sickness and accident leave. Plaintiff then began long-term disability leave on or about July 8, 2002. Plaintiff has not returned to work in defendant-employer's Building 61 or worked in any capacity since July 2001.
9. Analysis and sampling inspections of plaintiff's former home in 2002 revealed the presence of molds with the levels of the molds being comparable to the mold levels outdoors. Analysis and sampling inspections of plaintiff's current home in 2003 revealed the presence of a moderate amount of fungi on a sofa, and relatively high amounts of fungi and mold in the family room and basement.
10. Plaintiff's witness, Tim Dusto, testified at the hearing that plaintiff moved from her personal residence to a new home in May of 2002 due to the mold and fungi discovered to exist in her personal residence.
11. It is undisputed that there were approximately 145 to 150 water leaks between 1998 and 2002 in defendant-employer's Building 61. However, even Dr. Johanning, plaintiff's expert witness, testified that every building with chronic water leaks does not have toxic molds.
12. Approximately seven inspections and/or sampling episodes specific to mold took place in defendant-employer's Building 61 between September 1995, and January 2003. There were fungal spores of different types found, including several Stachybotrys
spores.
13. Fungal spores are ubiquitous in the outdoor and indoor environment. Fungi levels in non-problem indoor environments generally are less than or approximately the same as those outdoors; indoor problems may arise when there are one or more fungal species present in concentrations greater than found outdoors. The mere presence, however, of fungi indoors is not necessarily problematic, but depends on the species of fungi, the amount present, the length of exposure, and individual susceptibility to a particular fungus or fungi. Moreover, the presence of a mycotoxin-producing species does not mean that mycotoxins are actually present in the environment.
14. In fact, the Occupational Safety and Health Administration (OSHA), the National Institute of Occupational Safety and Health (NIOSH), as well as other occupational health-related associations have not established permissible exposure levels, recommended exposure limits, or other limit values for allergens.
15. Plaintiff has a history of being treated medically for tree, grass, and weed allergies since 1971, and in early 1996 plaintiff was found to be allergic to Penicillin. Plaintiff also has a history of upper respiratory ailments, migraines, endometriosis and fibroids that all predate the April 30, 2000 flood.
16. Prior and subsequent to the workplace flood of April 30, 2000, plaintiff has had a myriad of physical problems and complaints. These include, but may not necessarily be limited to: endometriosis, hematuria, allergic rhinitis, noncardiac chest pain, depression with anxiety and panic attacks, possible GERD, low back pain, heartburn, migraines, degenerative disc and joint disease, halitosis, left arm and facial numbness and tingling, vertigo, chronic throat pain, fatigue, abdominal pain, pericarditis, tinnitus and ear pain, hypoglycemia, kidney stone, and possible fibromyalgia. Plaintiff has been seen and treated by a large number of physicians for these complaints, many of her complaints have unknown etiology and even unknown diagnosis. Several of plaintiff's physicians have noted a possible somatic quality to plaintiff's complaints in that many of them cannot be explained from a physiological basis.
17. On May 9, 2000, plaintiff reported to her allergist that she had had a scratchy throat and ears for one week, and that her allergy symptoms had increased. Plaintiff was diagnosed with acute sinusitis.
18. On May 22, 2000, plaintiff reported to her family physician that she was unable to concentrate; she was diagnosed with possible panic attacks. Thereafter, she began to develop chest pain, low back pain, and abdominal pain. Plaintiff began seeking treatment from a number of different doctors, including a neurologist. Plaintiff continued to complain of dizziness, vertigo, stress, and anxiety, which some of the doctors noted may have a correlation to the fact that she had recently adopted a child with health problems from Romania. It was not until November 14, 2000 that plaintiff first reported to a physician, Dr. Avery, that her complaints may be related to a flood and alleged mold problems in the workplace.
19. According to plaintiff's medical records, many of plaintiff's medical problems predated the April 30, 2000 workplace flood. Plaintiff reported to Dr. Avery in August 2000 that she had been having chest pain since December 1999, and she reported to Dr. Avery in September 2000 that she had been having chronic throat pain for about a year. In May 2001 plaintiff reported to Dr. Rice at Duke's Rheumatology Clinic that her health was generally good until two years ago when she had a miscarriage, and that this event seemed to mark the onset of her migraines, heartburn, and bad breath. In addition, plaintiff reported to Dr. Hurwitz at Duke's Neurology Division that she had experienced left arm and face numbness as well as light-headedness and wooziness since November 1999. Plaintiff's medical history also confirms that her father had a neuromuscular disorder.
20. On October 8, 2001, Dr. Eckardt Johanning, a board certified family medicine physician who specializes in occupational and environmental medicine, evaluated plaintiff. Dr. Johanning took plaintiff's medical and occupational histories, reviewed her previous medical and other records, did a physical examination, and considered alternative exposures and diagnoses to come to a "differential diagnosis," i.e., he attempted to rule out any other diagnosis or cause of plaintiff's complaints. Plaintiff testified she has met with Dr. Johanning a total of two (2) times.
21. According to Dr. Johanning, plaintiff's tests revealed that she was highly sensitive to a number of molds. In addition, Dr. Johanning opined that plaintiff's symptoms are related to her exposure to allergen toxic fungi due to chronic water problems and leakage at the workplace, and that her workplace exposure was a significant contributing factor to the illnesses with which she apparently suffers. Dr. Johanning unilaterally discounted the effects of plaintiff's exposure to toxic or other molds at her home even though he recommended this testing which was much more temporal to plaintiff's complaints and was noted by Mr. Dusto, plaintiff's witness, as the reason for her new home purchase and her resulting move in 2002.
22. Dr. Johanning also referred plaintiff to Wayne A. Gordon, Ph.D., a psychologist who performed a neuropsychological evaluation on plaintiff on April 15 and 16, 2002. Dr. Gordon testified that his tests revealed that plaintiff suffered from cognitive impairment as a result of her exposure to toxic mold in the workplace, even though he admitted that he did not know how much mold or for how long plaintiff was exposed. Like Dr. Johanning, Dr. Gordon used a differential diagnosis to determine that there was no other cause for plaintiff's symptoms than her exposure to toxic mold, despite admitting that there were no peer-reviewed studies to support a differential diagnosis in alleged mold exposure cases. Dr. Gordon testified that he was not a mycologist and did not know about mold. Accordingly, his testimony is not afforded as much weight and credibility as that of other witnesses who do have an expertise in mold. Additionally, Dr. Gordon indicated that he did not take into consideration the medications plaintiff was taking at the time he administered his testing, that in his opinion it would not effect the out come. It should be noted that it would appear to be important as to what effect the various medications plaintiff was taking at the time of his testing because they could affect the outcome of the testing.
23. Defendants requested Dr. Paul Lees-Haley, tendered as an expert in clinical psychology and neuropsychology, to review plaintiff's medical records including Dr. Gordon's and Dr Johanning's reports and conclusions and render an expert opinion. Dr. Lees-Haley testified that Dr. Gordon's testing done on plaintiff was not a standard battery of tests as there is not one standard battery of tests used. According to Dr. Lees-Haley, some of plaintiff's test results with Dr. Gordon simply do not make any sense. For instance, plaintiff had many very high and superior test scores, while some were profoundly low, some even lower than would be seen in the average mentally retarded person. Dr. Lees-Haley testified that there is no scientific evidence showing a causal relationship between these deficits and plaintiff's purported mold exposure. While Dr. Lees-Haley acknowledged that he is not an expert qualified to testify regarding whether certain molds are toxic, based upon his review of the applicable research, he was able to testify that it has not been established that inhalation of mold spores or mycotoxins causes brain damage in humans. Accordingly, Dr. Lees-Haley's opinion is that there is no basis to conclude that plaintiff's exposure in the workplace, if any, to toxic molds placed her at an increased risk of developing the medical conditions with which she suffers, or that her job significantly contributed to her symptomatology. Dr. Lees-Haley also testified that is very important to know what medications a patient is taking at the time testing is performed because depending on the medication it can affect the outcome of the test.
24. Dr. Ronald Gots, a medical physician tendered as an expert in occupational and environmental medicine and toxicology (a doctorate in toxicology), also provided an expert opinion for defendants after reviewing plaintiff's medical records and technical reports. Dr. Gots noted that according to his interpretations, all of plaintiff's allergy testing from 1995 through 2003 were either negative or equivocal for mold allergies. In addition, Dr. Gots, an expert on causation and the health effects of mold contamination, further testified that some of plaintiff's physical complaints have nothing to do with mold allergies, and that Dr. Johanning's diagnosis of mold-induced toxic neurocognitive problems is not supported by the medical or toxicologic literature. It was the opinion of Dr. Gots that plaintiff's job did not place her at an increased risk as compared to members of the public not so employed of developing her symptomatology, and that plaintiff's employment did not significantly contribute to her medical problems.
25. Dr. Howard Weiner was tendered as an expert and noted as being board certified in internal medicine, allergy and immunology, and occupational and environmental medicine. Dr. Weiner also has a master's degree in industrial hygiene and toxicology. Defendants requested that Dr. Weiner undertake a record review of plaintiff's medical records. Consistent with Dr. Gots' testimony and findings, Dr. Weiner testified that there was no evidence-based medicine or literature of which he was aware that supported plaintiff's theory that cognitive deficits can be attributed to exposure to molds. Dr. Weiner noted that plaintiff's allergy testing was equivocal or negative for mold allergies, and he did not feel that plaintiff has a mold-related allergic disease or mycotoxosis. It was further the opinion of Dr. Weiner that plaintiff's job did not place her at an increased risk as compared to members of the public not so employed of developing her symptomatology, and that plaintiff's employment did not significantly contribute to her medical problems.
26. Plaintiff relies in large part on the Indoor Environmental Consultant (IEC) reports dated March 16, 2003 and March 23, 2004. These reports detailed fungal growth sites in Building 61 from testing in the building done on January 23, 2003. These reports concluded that the findings were not consistent with an acceptable indoor air quality environment. However, only a singleStachybotrys spore was found in one sample, and with the exception of one sample, the average outdoor exposure was 1.1 to 9.6 times greater than indoors, which is normal. Furthermore, this testing is not particularly persuasive or even relevant, as it took place almost three years after the workplace flood, and greater than a year and a half after plaintiff went out of work.
27. Dr. Gordon, the psychologist to whom plaintiff was sent and evaluated, was not given information regarding the amount of time that plaintiff was exposed to any mold in the workplace, and further, he was unaware of any properly controlled studies showing a relationship or link between indoor mold exposure and the development of cognitive impairments. In fact, Dr. Gordon agreed that the Centers for Disease Control has indicated that it has not been proven that there is a causal link between the presence of toxic molds and medical conditions such as memory loss.
28. While Dr. Gordon testified that there does not need to be a dose response (i.e., the extent to which a person's exposure to a hazardous substance causes a health problem) to render an opinion in this case, it is significant that Dr. Gots, a Ph.D.-level toxicologist, testified that dose response is a fundamental essential principle of basic toxicology, and that the dose of mycotoxins required to produce any kind of toxicity is in the one to ten million spore range. There is no evidence of record to indicate that there was ever found in Building 61 mycotoxin spores in that high a concentration in any sampling or testing done.
29. There is no evidence showing that plaintiff was exposed at some time or for certain periods of time to mold in the workplace that may have been toxic. In addition the evidence is insufficient on its face to prove that any alleged exposure caused plaintiff to develop the conditions with which she was subsequently diagnosed, particularly given the fact that there was evidence of mold and fungi in her own house and mold and fungi are ubiquitous in nature. The evidence, taken as a whole, shows that the mere presence of Stachybotrys does not necessarily mean that mycotoxins are or were present. In addition, the evidence, taken as a whole, is nebulous at best as to how much exposure, if any, to mycotoxins such asStachybotrys is necessary to cause health problems in humans or how much exposure, if any, plaintiff actually had.
30. Based upon the evidence and testimony taken as a whole, defendants' expert witnesses are afforded greater weight and credibility herein than that of plaintiff's witnesses, particularly based upon plaintiff's own expert witness admissions and testimony in this case.
31. From July 2001 through July 2002, plaintiff received SA benefits in the monthly amount of $8,210.00, for a total amount received of $98,333.41. These SA benefits are fully funded by defendant-employer.
32. In July 2002 plaintiff began receiving long-term disability benefits at 66.67% of her regular monthly compensation, or, $5,473.61 per month. Plaintiff was continuing to receive these benefits as of the date of the hearing in the matter, and had received a total of $80,914.23 in long-term disability benefits. These long-term disability benefits are fully funded by defendant-employer.
33. Based upon the greater weight of the evidence, there is insufficient evidence from which the undersigned can find and hold that plaintiff has proven that she contracted a compensable occupational disease by virtue of her alleged exposure to toxic mold in the workplace, either as a result of the April 30, 2000 flood or to her work conditions and work environment prior and subsequent to, and irrespective of, the April 30, 2000 flood.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff has failed by the greater weight of the evidence to prove that any disease or condition from which she suffers is characteristic of individuals engaged in the particular trade or occupation in which the claimant is engaged, as relates either to the April 30, 2000 flood or to her work conditions and work environment prior and subsequent to, and irrespective of, the April 30, 2000 flood. N.C. Gen. Stat. § 97-53(13); Rutledge v.Tultex Corp., 308 N.C. 85, 93, 301 S.E.2d 359 (1983).
2. Plaintiff has also failed by the greater weight of the evidence to prove that her employment conditions, as relates to either the period immediately following the April 30, 2000 flood or to her work conditions and work environment prior and subsequent to, and irrespective of, the April 30, 2000 flood, placed her at an increased risk as compared to members of the general public not so employed of contracting the diseases or conditions from which she allegedly suffers. N.C. Gen. Stat. §97-53(13); Rutledge v. Tultex Corp., 308 N.C. 85, 93,301 S.E.2d 359 (1983).
3. Plaintiff has further failed by the greater weight of the evidence to prove that there is a causal connection between her myriad medical problems and her employment with defendant-employer. N.C. Gen. Stat. § 97-53(13); Rutledge v.Tultex Corp., 308 N.C. 85, 93, 301 S.E.2d 359 (1983); Robbinsv. Wake Co. Bd. of Educ., 151 N.C. App. 518, 566 S.E.2d 139
(2002).
4. Plaintiff has not met her burden of proving that she contracted a compensable occupational disease within the meaning of the Workers' Compensation Act. N.C. Gen. Stat. § 97-53(13). Accordingly, plaintiff's claim for benefits under the Act must fail.
5. While the greater weight of the evidence leads to a conclusion that plaintiff's claim is not compensable under the North Carolina Workers' Compensation Act, if the claim were found to be compensable, defendants would be entitled to a full credit for all SA and all long-term disability benefits paid to plaintiff. N.C. Gen. Stat. § 97-42.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Under the law, plaintiff's claim for workers' compensation benefits must be, and the same is, HEREBY DENIED.
2. Each party shall bear its own costs of this proceeding.
This the ____ day of January, 2006.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/______________ PAMELA T. YOUNG COMMISSIONER